Unsealed NOV 1 6 2007

FILED *EX PARTE* UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____ - Civ-

DELL INC.; AND ALIENWARE CORPORATION

Plaintiffs,

vs.

BELGIUMDOMAINS, LLC; CAPITOLDOMAINS, LLC; DOMAINDOORMAN, LLC; NETRIAN VENTURES LTD.; IHOLDINGS.COM, INC.; JUAN PABLO VAZQUEZ a/k/a JP VAZQUEZ, an individual; and DOES 1-10;

Defendants.

**07 - 22674**

**CIV - LENARD**

*J TORRES*

FILED by _____ D.C.
INTAKE

OCT 1 0 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND
A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PAGE(S)

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................. 2

        A.      Plaintiffs' Business and Their Trademarks.............................................. 2

        B.      Defendants' Unlawful Cybersquatting Operations Generally ................. 3

        C.      Defendants' Cybersquatting of Plaintiffs' Marks ................................... 7

III.    PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* TRO ENJOINING
        DEFENDANTS' UNLAWFUL ACTIVITIES TO PREVENT FURTHER
        IRREPARABLE HARM ...................................................................................... 7

        A.      Plaintiffs Have A Substantial Likelihood of Success on the Merits of Their
                Cybersquatting Claim ............................................................................. 8

                1.      Defendants' Registration And Use Of Domain Names ............... 8

                2.      The Infringing Domain Names Are All Confusingly Similar to
                        Plaintiffs' Famous and Distinctive Marks ................................. 8

                        a)      Plaintiffs' Marks Are Distinctive And Famous ............... 8

                        b)      Defendants have Registered Nearly 700 Domain Names
                                That Are Confusingly Similar To Plaintiff's Marks ....... 9

                3.      Defendants Have a Bad-Faith Intent To Profit From Plaintiff's
                        Marks ...................................................................................... 10

                        a)      Factor I—The trademark or other intellectual property
                                rights of Defendants, if any, in the domain names—Favors
                                Plaintiffs ...................................................................... 11

                        b)      Factor II—The extent to which the domain names consist
                                of the legal name or commonly used names of
                                Defendants—Favors Plaintiffs ..................................... 11

                        c)      Factor III—Defendants' prior use of the domain names for
                                the bona fide offering of goods or services—Favors
                                Plaintiffs ...................................................................... 11

                        d)      Factor IV—Any bona fide noncommercial or fair use of the
                                mark under the domain names—Favors Plaintiffs ......... 11

                        e)      Factor V—Defendants' intent to divert consumers from
                                Plaintiffs' websites to Defendants' websites by creating a
                                likelihood of confusion—Favors Plaintiffs .................. 12

f)    Factor VI—Defendants' offer to transfer, sell, or otherwise assign the domain names to Plaintiffs or others for financial gain—is Neutral ........................................................................... 12

g)    Factor VII—Defendants' provision of material and misleading false contact information when registering the domain names and their intentional failure to maintain accurate contact information—Favors Plaintiffs .......................... 13

h)    Factor VIII—Defendants' registration or acquisition of multiple domain names that they know are identical or confusingly similar to marks of others—Favors Plaintiffs ........... 13

i)    Factor IX—The extent to which Plaintiffs' Marks are or are not distinctive and famous—Favors Plaintiffs .............................. 13

j)    Additional Bad-faith Factors Favor Plaintiffs ............................... 13

B.    Plaintiffs Have A Substantial Likelihood of Success On The Merits Of Their Counterfeiting Claim ....................................................................... 14

1.    Defendants Registered and Used Counterfeits of Plaintiffs' Marks Without Consent ............................................................................. 14

2.    Defendants' Use and Registration of Counterfeits of Plaintiffs' Marks Is Likely to Cause Confusion ......................................... 15

C.    There Is a Substantial Threat of Irreparable Injury to Plaintiffs If the Injunction Is Not Granted ...................................................................... 16

D.    The Threatened Injury to Plaintiffs Far Outweighs the Harm an Injunction May Cause Defendants ........................................................... 17

E.    The Requested Injunction Would Not Disserve the Public Interest ..................... 18

IV.    DEFENDANTS MUST BE RESTRAINED FROM DESTROYING AND MOVING EVIDENCE ................................................................................... 19

V.    CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*American Home Products Corp. v. Johnson Chemical Co.*,
    589 F.2d ..........................................................................................................................17

*Aztar Corp v. MGM Casino*,
    59 U.S.P.Q. 2d 1460 (E.D. Va. 2001)..........................................................................14

*Bauer Lamp Co. v. Shaffer*,
    941 F.2d 1165 (11th Cir. 1991) ....................................................................................15

*Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ......................................................................................11

*Burger King Corp. v. Lee*,
    766 F. Supp. 1149 (S.D. Fla. 1991) ..............................................................................16

*Burger King Corp. v. Majeed*,
    805 F. Supp. 994 (S.D. Fla. 1992) ................................................................................18

*Chandnani v. V. Secret Catalogue Inc.*,
    2001 U.S. Dist. LEXIS 8069 (S.D. Fla. Mar. 19, 2001)................................................7

*Chanel, Inc. v. Italian Activewear of Florida, Inc.*,
    931 F.2d 1472 (11th Cir. 1991) ....................................................................................14

*Frehling Enterprises v. International Select Group, Inc.*,
    192 F.3d 1330 (11th Cir. 1999) ....................................................................................15

*Harrods Ltd. v. Sixty Internet Domain Names*,
    157 F. Supp. 2d 658 (E.D. Va. 2001), *aff'd in part, rev'd in part*, 302 F.3d 214
    (4th Cir. 2002)...............................................................................................................10

*International Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*,
    303 F.3d 1242 (11th Cir. 2002) ......................................................................................7

*MPS IP Services Corp. v. Modis Commc'ns, Inc.*,
    2007 U.S. Dist. LEXIS 15637 (M.D. Fla. Mar. 6, 2007)..............................................14

*N. Light Tech., Inc. v. N. Lights Club*,
    236 F.3d 57 (1st Cir. 2001)............................................................................................10

*Opticians Association of America v. Independent Opticians of America*,
    920 F.2d 187 (3d Cir. 1990)..........................................................................................18

*PepsiCo, Inc. v. Distribuidora La Matagalpa, Inc.*,
    2007 U.S. Dist. LEXIS 40711 (S.D. Fla. June 5, 2007) ...............................................16

*Petmed Express, Inc. v. Medpets.com, Inc.*,
    336 F. Supp. 2d at 1221 ....................................................................................14, 15, 16

*Playboy Enterprises v. Asiafocus International, Inc.*,
   1998 U.S. Dist. LEXIS 10359 (E.D. Va. 1998)..............................................................14

*Processed Plastic Co. v. Commc'ns, Inc.*,
   675 F.2d 852 (7th Cir. 1982) ..........................................................................................18

*Shields v. Zuccarini*,
   89 F. Supp. 2d 634 (E.D. Pa. 2000) *aff'd* 254 F. 3d 476 (3rd Cir. 2001)................12, 16

*Shields v. Zuccarini*,
   254 F.3d 476 (3d Cir. 2001)...............................................................................10, 12, 13

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
   202 F.3d 489 (2d Cir. 2000)............................................................................................13

*Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing, Inc.*,
   2003 U.S. Dist. LEXIS 8788 (N.D. Ga. May 9, 2003) ...................................................14

## STATUTES

15 U.S.C. § 1065.....................................................................................................................2, 8, 9

15 U.S.C. § 1114(1) ....................................................................................................................14

15 U.S.C. § 1117(a) ....................................................................................................................14

15 U.S.C. § 1125(c)(2).................................................................................................................9

15 U.S.C. § 1125(d) .....................................................................................................................8

15 U.S.C. § 1125(d)(1)(I)-(IX) ..................................................................................................10

15 U.S.C. §1125(d)(2) ................................................................................................................14

15 U.S.C. § 1127..........................................................................................................................14

Fed. R. Civ. P. 65 ..................................................................................................................16, 18

## I.    INTRODUCTION

Plaintiffs, Dell Inc. ("Dell") and its wholly owned subsidiary, Alienware Corporation ("Alienware") (collectively "Plaintiffs"), own the famous and distinctive DELL trade name and trademarks (collectively "the DELL Marks") and the famous and distinctive ALIENWARE trade name and trademarks (collectively "the ALIENWARE Marks"), respectively. The DELL Marks and the ALIENWARE Marks are collectively referred to as the "Plaintiffs' Marks." Plaintiffs operate highly successful online businesses using their domain names dell.com and alienware.com.

Defendants, BelgiumDomains, LLC; CapitolDomains, LLC; DomainDoorman, LLC; Netrian Ventures LTD.; iHoldings.com, Inc.; Juan Pablo Vazquez a/k/a JP Vazquez; and Does 1-10 (collectively "Defendants") operate one of the largest and most nefarious cybersquatting schemes ever seen, having registered and used hundreds of thousands of domain names that are confusingly similar to, and in many cases counterfeits of, famous and well-known trademarks and trade names. Defendants' portfolio of domain names reads like a "who's who" of corporate America, and includes domain names containing a wide variety of famous trademarks and names and variations thereof. In fact, Defendants have registered at least 1,100 domain names confusingly similar to Plaintiffs' Marks, many of which are also counterfeits of Plaintiffs' Marks.

To hide their true identities and involvement in these unlawful activities, Defendants have engaged in a long-standing, deliberate, and intricate scheme. Defendants employ numerous shell entities, fictitious businesses, and personal names. Defendants further conceal their true identities and involvement by limiting the period of time each infringing domain name is registered, repeatedly moving domain names from one company to another to avoid having to pay for the domain name, and providing false contact information in various public records and databases, all to avoid detection by Plaintiffs and other trademark owners.

Because of Defendants' elaborate scheme to conceal their identities and activities, it was not until recently—following a months-long investigation of Defendants—that Plaintiffs began to understand the magnitude of Defendants' scheme and the lengths to which Defendants went to hide that scheme. Among other things, Plaintiffs only recently learned of Defendants' relationship to one another and identified more than a dozen aliases that Defendants used or use in connection with their unlawful activities. Even after this lengthy investigation, however, Plaintiffs are still unaware of the full scope of Defendants' scheme and all of the relevant parties and aliases involved.

Plaintiffs seek an *ex parte* temporary restraining order ("TRO"), and a preliminarily injunction upon expiration of the TRO, enjoining Defendants from registering, using, and trafficking

in infringing and counterfeit domain names and from destroying and moving evidence. Plaintiffs have also filed a motion concurrently herewith for an *ex parte* order (1) seizing certain items and business records of Defendants, (2) granting accelerated discovery, and (3) temporarily sealing the file for this litigation until Defendants are served with these orders.

As discussed below, the requested relief is necessary to prevent further irreparable harm to Plaintiffs and Plaintiffs' Marks by restraining Defendants' counterfeiting and cybersquatting activities. The requested relief also is necessary to prevent the loss or destruction of crucial evidence concerning those activities, the co-conspirators of Defendants in these illegal activities, and the extent of the damages to Plaintiffs. Defendants are highly likely to destroy evidence or move evidence out of the country if they receive notice of the filing of this action, and Plaintiffs will thus be deprived of an effective remedy unless the Court grants the requested relief.

In support of their Motion for Temporary Restraining Order and a Preliminary Injunction, Plaintiffs submit this Memorandum, and the supporting Declarations of Kate Burns, Arthur Lewis, and David J. Steele, and rely on their Complaint, the contents of the Court's file to date, and such further evidence and argument as may be presented at the hearing on their Motion.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs' Business and Their Trademarks

Dell is a leading manufacturer and distributor of computer systems and accessories through direct marketing channels. Building on the direct business model it pioneered, Dell receives customer orders for computer equipment via the Internet, e-mail, telephone and facsimile, and ships products directly to customers according to their customized specifications. Declaration of Kate Burns ("Burns Decl.") at ¶3. Dell also sells a large selection of computer peripheral products and renders an extensive array of computer-related services. (Burns Decl., ¶4.) Beginning in 1987, Dell created and began using its trade name, trademark and service mark DELL and variants thereof to identify and distinguish its products and services. (Burns Decl., ¶5.) These marks have been extensively promoted, marketed and used for almost twenty years, and have become famous. (Burns Decl., ¶¶ 6, 7.) Dell holds more than thirty federal registrations for its marks that feature or include the word "DELL," the first of which was registered in 1988, and several of them have become incontestable under 15 U.S.C. § 1065. (Burns Decl., ¶¶ 2, 8, 9.) Dell also holds federal registrations for several other trademarks, a good portion of which have become incontestable as well. (Burns Decl., ¶10.)

With its direct business model, Dell continues to be a pioneer and leader in using the Internet to market and sell its goods and services. (Burns Decl., ¶11.) Of course, Dell's website at

www.dell.com, which has been operating since 1994, is a lynchpin of its direct marketing and sales operations, with over half of Dell's domestic revenues being generated via the Internet. (Burns Decl., ¶¶ 11, 12.) This website is visited by millions of customers annually, making Dell one of the Internet's most successful online businesses; www.dell.com is itself a federally registered trademark of Dell. (Burns Decl., ¶¶13-14.) Dell also owns or is affiliated with a number of other domain names through which it conducts business, such as dellfinancialservices.com, delladapterprogram.com, dell4me.com, and delloutlet.com. (Burns Decl., ¶15.)

Alienware, a wholly owned subsidiary of Dell, is a leading manufacturer and distributor of high-performance computer systems for gaming, entertainment, and the generation of media content. Declaration of Arthur Lewis ("Lewis Decl.") at ¶¶ 2, 3. As with Dell, Alienware's goods are sold in direct marketing channels and largely over the Internet. (Lewis Decl., ¶3.) Alienware owns the incontestable federal registration for its ALIENWARE mark, and promotes this mark heavily on its decade-old website at www.alienware.com. (Lewis Decl., ¶¶ 4, 5.)

## B. **Defendants' Unlawful Cybersquatting Operations Generally**

Defendants operate a massive cybersquatting operation and have registered and used millions of domain names. Many of these domain names are confusingly similar to, dilutive of, or counterfeits of, famous or distinctive trademarks owned by others, including trademarks that also serve as the names of some of the world's most well-known companies. The famous trademarks that Defendants have cybersquatted include:   AMERICAN EXPRESS, BANK OF AMERICA, CINGULAR WIRELESS, DIRECT TV, FORD, GENERAL MOTORS, J.C. PENNEY, LAND ROVER, MAPQUEST, NASCAR, OFFICE DEPOT, RADIO SHACK, SEARS, TOYOTA, UNITED AIRLINES, VICTORIA SECRET, WALMART, XM SATELLITE, YAMAHA, and ZANTAC. (Declaration of David J. Steele ("Steele Decl."), ¶5 and Exs. D-E). In fact, Defendants' portfolio of domain names is so infested with domain names that infringe or are counterfeits of famous trademarks that the *representative* list of such names filed in support of Plaintiffs' Complaint, which includes only one famous mark for each letter of the alphabet, is more than 910 pages long and contains over 18,000 domain names. (Steele Decl., ¶5 and Exs. C-E.) Defendants register and use these confusingly similar and counterfeit domain names because they divert traffic from the trademark owners to Defendants for their financial gain.[1]

---

[1] Trademark owners have filed *hundreds* of administrative proceedings against Defendants relating to their infringing domain names. (Steele Decl., ¶15 and Ex. K.) Moreover, trademark owners have filed at least nine civil actions against Defendants for cybersquatting, and Defendants have been enjoined in six of those cases. (Steele Decl., ¶15 and Ex. P.)

Defendants identify available domain names they believe will be profitable because of anticipated Internet traffic resulting from "typosquatting"—domain names containing typographical variations of others' marks—and the consumer confusion it causes. Defendants also register and use domain names that combine others' marks (or variations thereof) with generic or descriptive terms. Defendants register hundreds of thousands of domain names each day, many of which are confusingly similar to or counterfeits of others' marks. (Steele Decl., ¶6.)

Defendants employ numerous shell entities, fictitious businesses, and personal names (collectively, "Defendant Entities"), as well as other technical means, to conceal their true identities and involvement in their unlawful cybersquatting scheme. (Steele Decl., ¶¶7-13.) Some of the Defendant Entities used (or formerly used) by Defendants include:

Shell Entities

- Caribbean Online International Ltd., Nassau, Bahamas
- Domain Drop S.A.,Charlestown, West Indies, Saint Kitts and Nevis
- Keyword Marketing, Inc., Charlestown, West Indies, Saint Kitts and Nevis
- Maison Tropicale S.A., The Valley, British West Indies, Anguilla
- Marketing Total S.A., Charlestown, West Indies, Saint Kitts and Nevis
- Click Cons. Ltd, Nassau, Bahamas
- Web Advertising, Corp., Nassau, Bahamas
- Wan-Fu China, Ltd., Nassau, Bahamas

Aliases

- Alvaro Collazo, Tarariras, Colonia 70000, R.O.U.
- Unasi Management Inc., Panama.
- Domaincar, Panama.
- Unasi (or Unaci) Management Inc., San Juan, Philippines.
- J. Lee, Kowloon, Hong Kong.
- Wang Lee Domains Ltd, Port Louis Mauritius.
- International Names Ltd., Nassau, Bahamas.
- Pertshire Marketing, Ltd, Tortola, British Virgin Islands.

(Steele Decl., ¶¶8-9.) Each of the Defendant Entities is an alter ego for, subsidiary of, or joint venturer of the others.[2] In short, the Defendant domain name registrars and the Defendant Entities are one and the same, *i.e.*, the domain name registrant. (Steele Decl., ¶¶7-9.)

---

[2] A Microsoft Corporation research team issued a report on typosquatting, titled *Strider Typo-Patrol: Discovery and Analysis of Large-Scale, Systematic Typo-Squatters* (the "Microsoft Report"). A copy of the Microsoft Report is attached to the Steele Declaration as Exhibit F. The purpose of the Microsoft Report is "to discover and investigate questionable websites in order to protect Internet users." The Microsoft Report details what Plaintiffs' independent research also concluded: "almost all of the potential typo-squatting domains reported ... are registered to the same company." The "same company" referred to in the report is "Unasi"—one of Defendants' fictitious entities and alter egos. The Microsoft Report was updated in January 2006 and detailed that Defendants changed the

Historical WHOIS ownership records[3] reveal that some or all of the Defendant Entities are used as part of Defendants' scheme. For example, the domain name americnaexpress.com listed "J Lee" as the registrant in March 2005; then "Unasi Inc." in August 2005; then "Wang Lee Domains Ltd." in August 2006; and then "Caribbean Online International Ltd." in May 2007. (Steele Decl., ¶17 and Ex. L.) Each WHOIS record has the same "create date" indicating that the domain name was never deleted and re-registered by any of the registrants, but was instead "transferred" from one to the other, to the other, etc. *Id.* Further, just as with the americnaexpress.com domain name, each of Defendants' shell entities uses or used BelgiumDomains, CapitolDomains, DomainDoorman, or iHoldings as the registrar for their domain name registrations. (*See* Exs. C and L to the Steele Decl.)

Defendants BelgiumDomains, CapitolDomains, DomainDoorman, Netrian, and iHoldings share or shared the same office space in Miami. Defendant Vazquez directs the day-to-day operations of these entities, as well as Defendants' use of shell entities, fictitious businesses, and personal names. Further, Defendant Netrian is listed in documents filed with the Florida Department of State's Office as the Corporate Manager for Defendants BelgiumDomains, CapitolDomains, and DomainDoorman.[4] Defendant iHoldings was formerly listed as the Corporate Manager for these companies. (Steele Decl., ¶7 and Ex. A.)

Defendants use the Defendant Entities to register hundreds of thousands of domain names every day, and to move these domain names back and forth among themselves to avoid having to pay registration fees and to avoid detection by trademark owners and others. (Steele Decl., ¶¶11-13.) Defendants delete many of the domain names registered within five days of registration to receive a

---

fictitious entity it then used from "Unasi" to "Domaincar"—another of Defendants' fictitious entities. (Steele Decl., ¶10 and Ex. C.)

[3] WHOIS data provides, among other information, the full name of the registrant of the domain name and the registrant's contact information. Domain name registrars, including Defendants BelgiumDomains, DomainDoorman, CapitolDomains, and iHoldings ("Defendant Registrars"), are required by the Internet Corporation for Assigned Names and Numbers ("ICANN") to provide "... an interactive web page and a port 43 WHOIS service providing *free public query-based access* to up-to-date (*i.e.*, updated at least daily) data concerning all active Registered Names sponsored by Registrar for each TLD in which it is accredited." *Registrar Accreditation Agreement* between ICANN and all its accredited registrars, at ¶ 3.3.1 (emphasis added), *available at* http://www.icann.org. (Steele Decl., ¶11.)

[4] Defendant Netrian appears to be an offshore holding company (licensed in the British Virgin Islands), notwithstanding that it lists its address in Miami with the Florida Department of State's Office. (Steele Decl., ¶2 and Ex. A.)

refund of Defendants' registration costs and to avoid detection by trademark owners.[5] *Id.* Because Defendants operate multiple domain name registrar companies and use multiple alter egos and shell entities, Defendants are able to continuously "kite"[6] domain names virtually without detection. *Id.* For example, after one of Defendants' Registrars registers an infringing domain name listing one of Defendants' shell entities as the registrant, the domain name is deleted within five days and then immediately registered by another of Defendants' Registrars listing another of Defendants' shell entities as the registrant. *Id.* Exhibit G to the Steele Declaration details several examples where an infringing domain name is passed from one of Defendants' Registrars to another, and then to another (*e.g.*, from DomainDoorman to BelgiumDomains to CapitolDomains and then back to DomainDoorman, then BelgiumDomains, and then CapitolDomains, etc.). Each subsequent registration lists one of Defendants' multiple alter egos or shell entities as the registrant of the domain name. *Id.* As the pattern repeats, Defendants often re-register the same domain names to the same shell entities. (Steele Decl., ¶13.)

Defendants' kiting scheme not only enables them to avoid paying the registration fees for the domain names, but it also tends to erase or at least obfuscate Defendants' "electronic tracks," making detection by trademark owners very difficult. (Steele Decl. ¶12.) Defendants further impede efforts by trademark owners to detect infringements by limiting the number of WHOIS queries that can be made using the WHOIS databases of Defendants' Registrars, allowing only a few queries per day. (Steele Decl., ¶16.) In short, Defendants' kiting scheme enables the continuous and indefinite infringement of Plaintiff's Marks, at almost no cost to Defendants.

As Defendants move these domain names back and forth every five days, they use the infringing domain names to lure Internet users searching for genuine websites associated with the famous or distinctive trademarks misspelled in Defendants' domain names. Defendants host websites at these domain names that display links and advertisements featuring goods or services directly competitive with or related to those sold or offered in connection with the trademarks. (Steele Decl.,

---

[5] The practice of registering and deleting domain names within five days that do not generate sufficient traffic to turn a profit in order to avoid paying for the registration is commonly referred to as "tasting." (Steele Decl., ¶11.)   Only registrars accredited by ICANN, including Defendant Registrars, are able to delete domain names; this feature is not generally available to the consuming public. *Id.*

[6] The practice of *repeatedly* registering, deleting, and reregistering the same domain name within five days to avoid paying for the registration is known as "kiting." (Steele Decl., ¶12.) Recent ICANN reports show that Defendants DomainDoorman, BelgiumDomains, and CapitolDomains are by far the top three registrars involved in domain name tasting. (Steele Decl., ¶24 and Ex. Q.)

¶14 and Exs. I-J.) The websites sometimes also display pop-up or pop-under advertisements. *Id.* Advertisers, search engines, and affiliate programs pay Defendants each time a user clicks on a link at the website or every time an advertisement is displayed. *Id.*

### C.    Defendants' Cybersquatting of Plaintiffs' Marks

Defendants have registered at least 1,100 domain names that are identical or confusingly similar to Plaintiffs' Marks, most of which are also counterfeits of Plaintiffs' Marks (Steele Decl., ¶¶3, 4 and Ex. B-C.) Defendants use these domain names to host websites that display links, advertisements, pop-up advertisements, and pop-under advertisements featuring goods or services that are directly competitive with or closely related to Plaintiffs' goods and services. (Steele Decl., ¶14 and Exs. I-J.) Defendants have received and continue to receive payment for advertising clicks and click-throughs on the websites hosted at these confusingly similar domain names. *Id.*

In fact, in the last month alone, Defendants have registered at least 146 additional domain names consisting of Plaintiffs' Marks (or variations thereof). (Steele Decl., ¶22 and Ex. O.) Plaintiffs' case for a TRO is especially compelling given Defendants' continued cybersquatting on a massive scale notwithstanding numerous objections and legal proceedings from trademark owners.

### III.    PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* TRO ENJOINING DEFENDANTS' UNLAWFUL ACTIVITIES TO PREVENT FURTHER IRREPARABLE HARM

Plaintiffs seek entry of a TRO, and a preliminary injunction upon expiration of the TRO, prohibiting Defendants from registering, using, and trafficking in any domain name that is confusingly similar to, or a counterfeit of, Plaintiffs' Marks, and from destroying or moving evidence. The Eleventh Circuit standards governing a TRO are the same as those for a preliminary injunction. *See Chandnani v. V. Secret Catalogue Inc.*, 2001 U.S. Dist. LEXIS 8069, at *5 (S.D. Fla. Mar. 19, 2001).

To obtain a TRO and a preliminary injunction, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to Plaintiffs outweighs the harm an injunction may cause Defendants, and (4) granting the injunction would not disserve the public interest. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002). As detailed below, Yahoo! has satisfied each of these elements.[7]

---

[7] Plaintiffs have asserted other claims in their Complaint, but is focusing on cybersquatting and counterfeiting for purposes of their request for temporary and preliminary injunctive relief.

**A.**     <u>Plaintiffs Have A Substantial Likelihood of Success on the Merits of Their Cybersquatting Claim</u>

Pursuant to the Anticybersquatting Consumer Protection Act ("ACPA"), cybersquatting is the (1) registration, use, or trafficking in, a domain name (2) that is identical or confusingly similar to a distinctive or famous trademark, (3) with a bad-faith intent to profit from the mark. 15 U.S.C. § 1125(d). As explained below, Defendants have repeatedly violated the ACPA, and Plaintiffs have a substantial likelihood of success on the merits of their ACPA claim.

### 1.     Defendants' Registration And Use Of Domain Names

As noted above, Defendants have registered and used at least 1,100 domain names that are confusingly similar to or are counterfeits of Plaintiffs' Marks. Defendants have used these confusingly similar domain names to host websites that display links, advertisements, pop-up advertisements, or pop-under advertisements featuring goods or services that are directly competitive with or closely related to Plaintiffs' goods and services.

### 2.     The Infringing Domain Names Are All Confusingly Similar to Plaintiffs' Famous and Distinctive Marks

#### a)     Plaintiffs' Marks Are Distinctive And Famous

Dell owns numerous United States trademark registrations for its DELL Marks. (Burns Decl., ¶2, and Exhibit A to the Burns Decl.) The DELL Marks have been used in interstate commerce by Dell for the past nineteen years to designate the products and services offered by DELL. (Burns Decl., ¶6.) Dell expends substantial effort and expense to protect the distinctiveness of the DELL Marks in the marketplace, and as a result, the DELL Marks are unique and distinctive and designate a single source of origin. (Burns Decl., ¶¶ 16.)

Alienware owns United States trademark registration No. 2,616,204 for its ALIENWARE Mark. (Lewis Decl., ¶4 and Exhibit A to the Lewis Decl.) Alienware has used the ALIENWARE Mark in interstate commerce for the past ten years to designate Alienware's products and services. (Lewis Decl., ¶6.) Alienware expends substantial effort and expense to protect the distinctiveness of the ALIENWARE Mark in the marketplace. (Lewis Decl., ¶8.) As such, the ALIENWARE Mark is unique and distinctive and designates a single source of origin. (Lewis Decl., ¶8.)

Dell also owns United States trademark registrations Nos. 2,756,363, 2,171,257, 2,254,835, 1,962,286, 1,977,038, and 1,930,206 for its AXIM, DIMENSION, INSPIRON, LATITUDE, OPTIPLEX, AND POWEREDGE marks, respectively. (Burns Decl., ¶10 and Exhibit B to the Burns Decl.) Registration Nos. 2,254,835, 2,171,257, 1,977,038, and 1,9302,06 are incontestable pursuant to 15 U.S.C. § 1065. Id. These marks have been used in interstate commerce by Dell for years to

8

designate the products and services offered by Dell. Id. Dell expends substantial effort and expense to protect each of these mark's distinctiveness in the marketplace. As such, these marks are unique and distinctive and designate a single source of origin. Id.

Plaintiffs' Marks are also famous marks. "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark possesses the requisite degree of recognition, courts may consider all relevant factors, including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered. Id.

Plaintiffs' Marks have, for years, been extensively used in throughout the country. For several years Plaintiff Dell (including it owned subsidiary, Alienware) has been the world's largest direct seller of computer systems. (BurnsDecl., ¶17.) During the last fiscal year Plaintiffs had revenues of over $55 billion dollars. Id. Plaintiffs' Marks are widely known and recognized among consumers and members of the trade throughout the country. Having been widely promoted to the general public, and having exclusively identified Plaintiffs and their products and services, Plaintiffs' Marks symbolize the tremendous goodwill associated with Plaintiffs and are a property right of incalculable value. (Burns Decl., ¶¶ 18, 20, and Lewis Decl., ¶¶ 8, 13.) Further, Plaintiffs' Marks have long enjoyed unquestionable fame as a result of favorable general public acceptance and recognition. (Burns Decl., ¶19, and Lewis Decl., ¶12.) Plaintiffs' Marks are the subject of numerous federal registrations, many of the registrations are incontestable under 15 U.S.C. § 1065. (Burns Decl., ¶¶ 2, 9, 10, and Lewis Decl., ¶ 4.)

**b)     Defendants have Registered Nearly 700 Domain Names
That Are Confusingly Similar To Plaintiff's Marks**

Defendants have registered at least 1,100 domain names that are confusingly similar to Plaintiffs' Marks. A representative list of these confusingly similar domain names includes names like: dellalptops.com; delloultet.com; delldot.com; alienwaere.com; aliwenware.com; and alienwarre.com. The full list of these confusingly similar domain names appears in Exhibit B to the Steele Declaration.

Many of Defendants' domain names are confusingly similar to Plaintiffs' Marks because they are misspellings of Plaintiffs' Marks. For example, alienwarre.com merely adds an extra letter "r" in the ALIENWARE Marks; delloutlet.com merely transposes the letters "l" and "t" in Dell's own domain name delloutlet.com; and al9ienware.com merely inserts the number "9" (the number "9"

9

and the letter "i" are close to each other on the keyboard and will often be pushed by accident when typing). Such misspellings are "confusingly similar" under the ACPA. "A reasonable interpretation of conduct covered by the phrase 'confusingly similar' is the intentional registration of domain names that are misspellings of distinctive or famous names, causing an Internet user who makes a slight spelling or typing error to reach an unintended site." *Shields v. Zuccarini,* 254 F.3d 476, 484 (3d Cir. 2001); *see also N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n.14 (1st Cir. 2001) (the identical or confusingly similar requirement of the ACPA looks to the facial similarity of the domain name with the mark).

Other of Defendants' infringing domain names merely append to Plaintiffs' Marks a generic or descriptive word associated with Plaintiffs' goods or services. For example, the dell-desktop-computers.com domain name merely appends the words "desktop" and "computers" to one of the DELL Marks.8 Such domain names are also "confusingly similar" under the ACPA. *See, e.g., Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 67-78 (E.D. Va. 2001), *aff'd in part, rev'd in part*, 302 F.3d 214 (4th Cir. 2002) (domain names adding descriptive or generic terms like "bank," "financial," and "shopping" to the mark HARRODS held confusingly similar).

Further, Defendants host websites at many of the 1,100 infringing domain names, displaying advertisements and links to goods and services that are directly competitive or closely related to Plaintiffs' goods and services. As a result, Internet users searching for Plaintiffs, and their goods and services will find goods and services advertised at Defendants' websites that they would expect originates with Plaintiffs, further contributing to the confusion caused by Defendants' domain names. Defendants' effort to capitalize on Internet users' misspellings and mistypings—when such users are actually looking for Plaintiffs' websites—is further evidence that each of the domain names is confusingly similar to Plaintiffs' Marks.

### 3.    Defendants Have a Bad-Faith Intent To Profit From Plaintiff's Marks

In determining whether Defendants possessed the required bad-faith intent to profit from Plaintiff's Marks, the ACPA identifies nine factors for courts to examine. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX). In this case, not surprisingly, these factors strongly support a finding that Defendants registered and used at least 1,100 confusingly similar domain names with a bad-faith intent to profit from Plaintiffs' Marks.

---

[8] As discussed above, the DELL Marks are famous and used in connection with, among other goods and services, desktop computers.

a)   **Factor I—The trademark or other intellectual property rights of Defendants, if any, in the domain names—Favors Plaintiffs**

Defendants have no intellectual property rights in any of the 1,100 confusingly similar domain names. Nor have Plaintiffs authorized Defendants to register or use Plaintiffs' Marks within domain names or otherwise. (Burns Decl, ¶23 and Lewis Decl., ¶10.) Factor I thus supports a finding that Defendants registered the confusingly similar domain names with a bad-faith intent to profit from Plaintiffs' Marks.

b)   **Factor II—The extent to which the domain names consist of the legal name or commonly used names of Defendants—Favors Plaintiffs**

None of the 1,100 confusingly similar domain names consist of the legal name of any Defendant. Nor is any Defendant commonly known by any of these confusingly similar domain names. There is no legitimate use for them by anyone but Plaintiffs. Therefore, Factor II also supports a finding of a bad-faith intent to profit.

c)   **Factor III—Defendants' prior use of the domain names for the bona fide offering of goods or services—Favors Plaintiffs**

Defendants use the confusingly similar domain names to lure unsuspecting Internet users trying to reach Plaintiffs' websites to websites featuring advertisements and links to goods or services directly competitive with or closely related to Plaintiffs' goods and services. It is well settled that misdirecting Internet traffic with the intent to trade on another party's mark is unlawful. *Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999). Because this unlawful use cannot be a bona fide offering of goods or services, Factor III also favors Plaintiffs.

d)   **Factor IV—Any bona fide noncommercial or fair use of the mark under the domain names—Favors Plaintiffs**

Defendants' use of the 1,100 confusingly similar domain names was and is purely commercial. They selected and registered domain names that would generate revenue from advertisers, search engines, and affiliate programs, and maximize Defendants' returns. Further, none of Defendants' websites contain or contained any commentary about, or comparisons of, Plaintiffs' goods or services, and thus Defendants' use was and is not a noncommercial or bona fide fair use. (Steele Decl., ¶14 and Exs. I-J.) Thus, Factor IV also supports a finding of Defendants' bad-faith intent to profit.

**e)    Factor V—Defendants' intent to divert consumers from Plaintiffs' websites to Defendants' websites by creating a likelihood of confusion—Favors Plaintiffs**

Given the striking similarity between the 1,100 confusingly similar domain names and Plaintiffs' Marks, Defendants' intent was unquestionably to divert consumers navigating to Plaintiffs' websites to their own commercial websites. "Cybersquatters often register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, many of which are . . . sites that derive[s] advertising revenue based on the number of visits, or 'hits,' the site[s] receive[]." *Zuccarini,* 254 F.3d at 484. Defendants' intent was the same as that of the defendants in *Zuccarini*: "to register a domain name in anticipation that consumers would make a mistake, thereby increasing the number of hits his site would receive, and, consequently, the number of advertising dollars he would gain." *Id.*

The only reason that consumers would access the websites at any of the 1,100 confusingly similar domain names is because these domain names are misspellings, mistypings, or variations of Plaintiffs' Marks. Defendants thus intend to create confusion to capitalize on the mistakes of unsuspecting consumers looking for Plaintiffs' websites. Many of these confusingly similar domain names feature links to goods and services directly competitive or closely related to Plaintiffs' goods and services, precisely because Defendants' desire to profit from consumers seeking Plaintiffs' websites.

Finally, Defendants keep only those domain names that generate sufficient traffic from confused Internet users to ensure that Defendants make a profit over the registration fees. Defendants thus knew that many of the nearly 1,100 confusingly similar domain names it registered were receiving traffic solely because they were misspellings, mistypings, or variations of Plaintiffs' Marks. Notwithstanding this knowledge, and Plaintiffs and other trademark owners' prior objections, Defendants continued to register thousands of confusingly similar domain names. Accordingly, Factor V favors Plaintiffs.

**f)    Factor VI—Defendants' offer to transfer, sell, or otherwise assign the domain names to Plaintiffs or others for financial gain—is Neutral**

Plaintiffs are not aware at this time of any evidence that Defendants sold or offered to sell the 1,100 confusingly similar domain names for financial gain. Factor VI is thus neutral.

12

g)    **Factor VII—Defendants' provision of material and misleading false contact information when registering the domain names and their intentional failure to maintain accurate contact information—Favors Plaintiffs**

Defendants employ numerous means to conceal their true identities and involvement in the registration and use of the infringing domain names, including use of numerous shell entities, fictitious businesses, and personal names. Defendants have exhibited a pattern of prior conduct of failing to list or maintain accurate contact information by listing fictitious businesses and personal names as the domain name registrants. Defendants also intentionally limit the number of WHOIS queries that can be made using their systems, allowing only a few queries per day.

h)    **Factor VIII—Defendants' registration or acquisition of multiple domain names that they know are identical or confusingly similar to marks of others—Favors Plaintiffs**

Courts consider excessive numbers of infringing domain names as strong proof of bad faith. *See Zuccarini,* 254 F.3d at 485 n.5 (Zuccarini's registration of thousands of Internet domain names that are identical or confusingly similar to the distinctive marks of others reflects a "pattern of behavior . . . consistent with a bad faith intent to profit"). Here, Defendants have engaged in one of the largest cybersquatting operations ever witnessed, having registered at least tens of thousands of infringing domain names. Defendants have registered so many domain names that infringe famous trademarks that the representative list filed in support of Plaintiffs' Complaint contains nearly 18,000 such domain names. (Steele Decl., ¶5 and Exs. D-E.). Factor VIII thus strongly supports a finding of Defendants' bad-faith intent to profit from Plaintiffs' Marks.

i)    **Factor IX—The extent to which Plaintiffs' Marks are or are not distinctive and famous—Favors Plaintiffs**

Factor IX also strongly supports Defendants' bad-faith intent to profit. As shown above, Plaintiffs' Marks are some of the most famous and distinctive marks in the world.

j)    **Additional Bad-faith Factors Favor Plaintiffs**

The nine factors listed by the ACPA are not exclusive, and courts expressly indicate that other factors may be considered. *See, e.g., Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000). Here, Defendant registrars are in a position of trust as ICANN-accredited registrars. By concealing their unlawful activities, however, they have grossly abused their position of trust to the detriment of Plaintiffs' customers and the general public, as well as Plaintiffs and

countless other trademark owners. This abuse of trust further supports, and indeed amplifies, Defendants's bad-faith intent.[9]

### B. Plaintiffs Have A Substantial Likelihood of Success On The Merits Of Their Counterfeiting Claim

To establish liability for counterfeiting, Plaintiffs must prove that Defendants used a "counterfeit" of Plaintiffs' registered Plaintiffs' Marks without Plaintiffs' consent in connection with the sale, offering for sale, distribution, or advertising of goods or services and that such use is likely to cause confusion or to cause mistake or deceive. 15 U.S.C. § 1114(1)(a). The Lanham Act defines "counterfeit" as a spurious mark that is identical with, or substantially indistinguishable from a registered mark. 15 U.S.C. § 1127. A showing of intent or bad faith is unnecessary to establish liability for counterfeiting under 15 U.S.C. § 1114(1)(a) or to seek injunctive relief pursuant to 15 U.S.C. § 1117(a). *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1475-76 (11th Cir. 1991); *Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing, Inc.*, 2003 U.S. Dist. LEXIS 8788, at *43 (N.D. Ga. May 9, 2003).

#### 1. Defendants Registered and Used Counterfeits of Plaintiffs' Marks Without Consent

A domain name can constitute a counterfeit mark. For example, in *Petmed Express, Inc. v. Medpets.com, Inc.*, plaintiff PetMed Express owned federal trademark registrations for the marks PETMED EXPRESS, INC. and 1888PETMEDS, and marketed pet-care medicines and products over the Internet using the domain names 1888petmeds.com, petmeds.com, 1800petmeds.com, and petmedexpress.com. *Petmed Express, Inc. v. Medpets.com, Inc.*, 336 F. Supp. 2d 1213, 1216 (S.D. Fla. 2004). The defendants began selling pet-care products via a website using the domain names medpets.com and 1888medpets.com. The court found that "Defendants' domain names are counterfeit marks likely to confuse consumers into [mistakenly] thinking that [defendants' websites] www.medpets.com and www.1888medpets.com are associated with PetMed." *Id.* at 1220. The court awarded, *inter alia*, statutory damages under the Trademark Counterfeiting Act. *Id.* at 1220-21.[10]

---

[9] Because Defendants are *both* the registrant and registrar, Defendants do not qualify for the "safe harbor" provision of the ACPA that exempts domain name registrars from liability "for injunctive or monetary relief . . . except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order." 15 U.S.C. §1125(d)(2)(D)(ii). Moreover, even if Defendants were just the registrar, they would not qualify for this exemption because they have acted clearly in "bad faith" and with "reckless disregard" of known trademark rights of Plaintiffs and countless other trademark owners.

[10] Other courts have also held that domain names can constitute counterfeit marks. *See, e.g., MPS IP Servs. Corp. v. Modis Commc'ns, Inc.*, 2007 U.S. Dist. LEXIS 15637, at *8-9 (M.D. Fla. Mar. 6,

Similar to the *Petmed* defendants, Defendants have registered numerous domain names without Plaintiffs' consent that are identical to, or substantially indistinguishable from, Plaintiffs' Marks. Plaintiffs' Complaint ¶123 lists numerous examples of Defendants' 1,100 confusingly similar domain names that Plaintiffs assert are counterfeits of Plaintiffs' Marks. These domain names either contain the DELL Marks (*e.g.*, dell-computers-help.com), or differ from the ALIENWARE Marks by only one character (*e.g.*, al9ienware.com). In some cases, such as dellinkprinter.com, Defendants add a generic or descriptive term associated with Plaintiffs' goods or services. These domain names are "counterfeits" because they are identical to, or substantially indistinguishable from, Plaintiff's registered Plaintiffs' Marks, and the advertising services offered by Defendants under such "counterfeit" domain names are identical to those covered by Plaintiffs' federal registrations.

### 2.   Defendants' Use and Registration of Counterfeits of Plaintiffs' Marks Is Likely to Cause Confusion

Like the defendants' domain names in *Petmeds*, Defendants' domain names containing counterfeits of Plaintiffs' Marks are likely to cause confusion. *Id.* at 1220. Defendants use (or used) Plaintiffs' Marks (and substantially indistinguishable variations thereof) in their domain names to derive benefit from the goodwill associated with Plaintiffs' Marks. Where, as here, a defendant adopts a plaintiff's mark intending to derive such benefit, that intent alone may justify an inference that a likelihood of confusion exists. *See Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999); *see also Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1172 (11th Cir. 1991) (applying a rebuttable presumption of likelihood of confusion based on an intent to copy).

Likelihood of confusion may also be determined by considering the following seven factors: (1) the mark's inherent strength); (2) similarity of marks; (3) similarity of the products that the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) the defendant's intent; and (7) actual confusion. *Frehling Enters*, 192 F.3d at 1335.

These seven factors also weigh in favor of a likelihood of confusion because: (1) Plaintiffs' Marks are distinctive and famous, and entitled to a broad scope of protection; (2) Defendants' domain names are identical or substantially indistinguishable from Plaintiffs' Marks as shown

---

2007) (citing *Petmed Express*) (holding defendant's website using the domain name modis.com offering IT consulting services counterfeited plaintiff's federally registered MODIS mark for IT consulting services); *see also Aztar Corp v. MGM Casino*, 59 U.S.P.Q.2d 1460, 1463 (E.D. Va. 2001), *adopted by*, 2001 U.S. Dist. LEXIS 13110 (E.D. Va. Apr. 9, 2001 (finding domain name tropicanacasino.com counterfeited registered TROPICANA mark); *Playboy Enters. v. Asiafocus Int'l, Inc.*, 1998 U.S. Dist. LEXIS 10359, at *23 (E.D. Va. 1998) (cited by *Petmed Express*) (holding content of websites at domain names asian-playmates.com and playmates-asian.com counterfeited registered PLAYBOY and PLAYMATE marks).

above; (3) the goods and services advertised under Defendants' scheme are identical to, competitive with, or closely related to the goods and services offered by Plaintiffs and covered by their registrations for Plaintiffs' Marks; (4) Defendants' "customers" are the same as Plaintiffs' customers, because they *are* Plaintiffs' customers, i.e., Defendants are targeting customers of Plaintiffs who misspell or mistype Plaintiffs' Marks as the customers are seeking to navigate to Plaintiffs' websites; (5) both Defendants and Plaintiffs use web pages to advertise goods and services to consumers on the Internet; (6) there is no other point to Defendants' scheme but to trade on the reputation and goodwill of Plaintiffs by misdirecting Internet users for Defendants' commercial gain;[11] and (7) because no Internet user intentionally starts out mistyping a well-known trademark to find competitors' websites, each time an Internet user looking for Plaintiffs' web properties mistakenly reaches any of Defendants' websites constitutes an instance of actual confusion.

### C.   There Is a Substantial Threat of Irreparable Injury to Plaintiffs If the Injunction Is Not Granted

Plaintiffs face a genuinely substantial threat of serious irreparable injury if an injunction does not issue, both legally and factually. Where a trademark owner shows a likelihood of confusion, irreparable injury is presumed. *PepsiCo, Inc. v. Distribuidora La Matagalpa, Inc.*, 2007 U.S. Dist. LEXIS 40711, at *14-15 (S.D. Fla. June 5, 2007) (citation omitted) ("trademark infringement and unfair competition by their very nature result in irreparable injury because of the attendant loss of goodwill, reputation and business"); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1157 (S.D. Fla. 1991) ("[t]he existence of a likelihood of confusion constitutes irreparable injury as a matter of law sufficient to satisfy the requirements of Fed. R. Civ. P. 65").

Even without this strong presumption, Plaintiffs are clearly harmed every day that their customers are diverted to Defendants' websites. Plaintiffs lose control over the reputation of their trademarks when consumers cannot use those marks to reliably reach Plaintiffs' Internet services, without being hijacked by Defendants along the way. The gravity of injury to Plaintiffs is further enhanced because "[Defendants' counterfeit] marks appear[] on the Internet, thereby reaching a substantial number of customers." *Petmed*, 336 F. Supp. 2d at 1221. *See Shields v. Zuccarini*, 89 F. Supp. 2d 634, 641 (E.D. Pa. 2000) *aff'd* 254 F. 3d 476 (3rd Cir. 2001) ("this sort of injury is not

---

[11] As shown above, Plaintiffs are not required to prove Defendants' bad-faith or intent to prevail. Nevertheless, these factors are both present here. Defendants continued to engage in its infringing activities despite Plaintiffs' many objections. Moreover, it is inconceivable that Defendants could appropriate the famous trademarks and trade names from countless major businesses and not know they were dealing in marks belonging to others and protected by law.

easily compensable after the fact, as it will be nearly impossible to discover how many Internet users did *not* visit [Plaintiffs'] site because of [Defendant's] domain names") (emphasis in original). The injury to Plaintiffs, which operates extensive online businesses, is thus real, immediate, and irreparable.

Moreover, as discussed above, in the last month alone, Defendants have registered at least 146 additional domain names consisting of misspellings and mistypings of Plaintiffs' Marks, or merely appending a generic or descriptive term to Plaintiffs' Marks (or a variation thereof). (Steele Decl., ¶22 and Ex. O.) This repeated and massive infringement, in blatant disregard of Plaintiffs' well-established trademark rights, demonstrates the need for the requested relief. Unless Defendants are temporarily restrained, they will continue to violate Plaintiffs' rights, and cause immediate and further irreparable harm to Plaintiffs and Plaintiffs' Marks.[12]

Because of Defendants' elaborate scheme to conceal their identities and activities, it was not until recently—following a months-long investigation of Defendants—that Plaintiffs began to understand the magnitude of Defendants' scheme and actions Defendants took to hide that scheme. Among other things, Plaintiffs only recently learned of Defendants' relationship to one another and identified more than a dozen aliases that Defendants used or use in connection with their unlawful activities. Even after this lengthy investigation, however, Plaintiffs are still unaware of the full scope of Defendants' scheme and all of the relevant parties and aliases involved.

### D.      The Threatened Injury to Plaintiffs Far Outweighs the Harm an Injunction May Cause Defendants

As against the substantial injury to Plaintiffs discussed above, the harm to Defendants' "legitimate" business interests are negligible because Defendants *have no* legitimate business interests in their cybersquatting scheme. Defendants are not a good-faith competitor or participant in Plaintiffs' market. Defendants have no basis to complain about the effects of an injunction:

> As aptly noted in *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir. 1978), "one who adopts the mark of another for similar goods acts at his own peril," since he has no claim to the profits or advantages thereby derived. Any harm suffered by defendants was brought about by their own actions. . . Defendants' self-inflicted harm is far outweighed by the immeasurable damage done [to the plaintiff] by the infringement of its Marks. Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined.

---

[12] Defendants have not only refused to respect Plaintiffs' rights, as noted above, various trademark owners have taken action against Defendants' cybersquatting activities in the form of administrative proceedings and lawsuits.

*Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992). Indeed, Defendants' intentional and reckless cybersquatting and counterfeiting of Plaintiffs' Marks carried with it a clear risk of an injunction and damages. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990); *Processed Plastic Co. v. Commc'ns, Inc.*, 675 F.2d 852, 859 (7th Cir. 1982) (finding defendant had copied plaintiff's toy car and thus "cannot now complain that having to mend its ways may be too expensive").

As a practical matter, Plaintiffs seek an injunction against a very small portion of Defendants' operation—only the portion that infringes Plaintiffs' Marks. Unless an injunction issues, Defendants will continue to register confusingly similar domain names and counterfeit domain names, causing further harm to Plaintiffs and the public. On the other hand, granting an injunction will prevent Defendants only from profiting from their illegal behavior, which is not a cognizable "hardship" that this Court should consider. Moreover, nothing in the injunction would prevent Defendants from registering non-infringing domain names. Finally, if the Court issues an injunction, Plaintiffs may be required to post a bond that will compensate Defendants for any possible monetary harm they might suffer if the injunction later is deemed improper. *See* Fed.R.Civ.P. 65(c). In short, the balance of hardships tips strongly in Plaintiffs' favor.[13]

### E.     The Requested Injunction Would Not Disserve the Public Interest

Finally, the injunction sought here would clearly not disserve the public interest. As explained above, Defendants are trading on the fame and goodwill of others' trademarks to divert Internet users for Defendants' commercial gain. Putting a preliminary end to this practice as it relates to Plaintiffs' Marks would be a benefit, not a disservice, to the public by protecting it from confusion and deception. *Majeed*, 805 F. Supp. at 1006 (explaining that the public has an interest in preventing consumer confusion).

---

[13] In this case, filing UDRP complaints against Defendants would not provide effective relief for several reasons. First, despite having numerous UDRP complaints filed against them, Defendants have not stopped or even curtailed their cybersquatting. Second, the only relief available in a UDRP proceeding is transfer or cancellation of the domain names; there is no injunctive or monetary relief. Adverse UDRP decisions thus do not prevent cybersquatters like Defendants from registering more infringing domain names as Defendants have done here. (*See* Steele Decl., ¶ 15.) Accordingly, the only effective way to deal with Defendants and to stop this vicious cycle of cybersquatting is to obtain an injunction preventing Defendants from registering infringing and diluting domain names in the future.

## IV.   DEFENDANTS MUST BE RESTRAINED FROM DESTROYING AND MOVING EVIDENCE

While under normal circumstances commencing litigation would itself be sufficient to put a defendant on notice that all materials potentially usable as evidence should be preserved, these are not normal circumstances. Defendants are engaged in a nefarious scheme and they have taken and continue to take many affirmative steps to conceal it. The risk that Defendants will destroy or move relevant data or documents is great. Defendants have employed numerous and extensive devices to avoid detection by trademark owners. Further, the Defendant Entities have extensively employed offshore locations to further obscure detection in an effort to limit U.S. jurisdiction. Defendants BelgiumDomains, CapitalDomains, and DomainDoorman are each managed by Netrian, which itself appears to be an offshore company.

Further increasing the risk that Defendants may destroy or move evidence is the ease with which the records Plaintiffs seek to seize can be destroyed and transferred. Much of the evidence Plaintiffs hope to use in the prosecution of this action is in electronic form and subject to quick, easy, untraceable destruction by Defendants. For example, most if not all of the domain name registration, renewal, and transfer process is done online, *i.e.*, electronically. Moreover, domain name registrants generally receive notifications relating to every aspect of the domain name registration, renewal, and transfer process by email. E-mail is clearly the customary and preferred method of communication for domain name matters. In addition, the process for Defendants receiving payments for advertising clicks and click-throughs on their websites corresponding to the infringing domain names is handled primarily if not exclusively by electronic means. (Steele Decl., ¶23.)

Accordingly, Defendants must be enjoined from destroying and moving any of their business records, and ordered to retain all relevant records.

## V.   A BOND, IF REQUIRED AT ALL, SHOULD BE MINIMAL

If this Court believes that Plaintiffs must post a bond to comply with the statute, a minimal bond will suffice. As discussed in Plaintiffs' Memorandum in support of this Motion, Defendants have no legitimate business interests in trademark counterfeiting and its customer-diversion scheme. Further, for the brief period from now until the preliminary injunction hearing, Defendants' losses from being unable to counterfeit and infringe Plaintiffs' Marks will be *de minimus*. Accordingly, if the Court believes a bond is necessary, Plaintiffs propose an amount of $10,000.

## VI.   CONCLUSION

For the above reasons, Plaintiffs request that the Court enter an *ex parte* TRO, and a preliminarily injunction upon expiration of the TRO.

DATED: *October 10, 2007*                    Respectfully submitted,

By: _____
     Mimi L. Sall (Florida Bar No. 436704)
     E-Mail: msall@swmwas.com
     STEARNS WEAVER MILLER WEISSLER
     ALHADEFF & SITTERSON, P.A.
     200 East Las Olas Boulevard, Suite 2100
     Fort Lauderdale, Florida  33301
     Tel.: (954) 462-9500
     Fax: (954) 462-9567

     David J. Steele (pro hac vice pending)
     Email: david.steele@cph.com
     CHRISTIE, PARKER & HALE, LLP
     3501 Jamboree Road
     Suite 6000 - North Tower
     Newport Beach, CA  92660
     Tel: (949) 476-0757
     Fax:  (949) 476-8640

     Howard A. Kroll (pro hac vice pending)
     Email: howard.kroll@cph.com
     CHRISTIE, PARKER & HALE, LLP
     350 W. Colorado Boulevard, Suite 500
     Pasadena, CA  91105
     Tel: (626) 795-9900
     Fax:  (626) 577-8800

     Attorneys for Plaintiffs DELL INC. AND
     ALIENWARE CORPORATION

I:\W-LIT\05812 (Dell)\001\PLEADINGS\TRO Memo FINAL.doc

20