Unsealed _____ NOV 16 2007

**FILED *EX PARTE* UNDER SEAL**

SEALED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **07 - 22674** - Civ- **JORDAN**

DELL INC.; AND ALIENWARE CORPORATION,

        Plaintiffs,

    vs.

BELGIUMDOMAINS, LLC; CAPITOLDOMAINS,
LLC; DOMAINDOORMAN, LLC; NETRIAN
VENTURES LTD.; IHOLDINGS.COM, INC.;
JUAN PABLO VAZQUEZ a/k/a JP VAZQUEZ, an
individual; and DOES 1 – 10;

        Defendants.

---

[PROPOSED] ORDER

**GRANTING PLAINTIFFS' MOTION FOR *EX PARTE* TEMPORARY RESTRAINING
ORDER AND FOR A PRELIMINARY INJUNCTION**

This matter comes before this Court following Plaintiffs, Dell Inc.'s ("Dell") and its wholly

owned subsidiary, Alienware Corporation's ("Alienware") (collectively "Plaintiffs"), filing of a

Complaint and a motion for an *ex parte* temporary restraining order and a preliminary injunction

upon expiration of the temporary restraining order. Pursuant to Federal Rules of Civil Procedure 64

and 65 and 15 U.S.C. § 1116, and based upon the evidence submitted and the arguments made by

Plaintiffs, the Court makes the following Finding of Facts and Conclusions of Law.

**I.    FINDINGS OF FACT**

    **A.    Parties and Action**

    1.    Dell is a Delaware corporation having its principal place of business in Round Rock,

Texas.



2.      Alienware is a Florida corporation having its principal place of business in Miami, Florida.

3.      Defendants BelgiumDomains, LLC, a Florida limited liability company; CapitolDomains, LLC, a Florida limited liability company; DomainDoorman, LLC, a Florida limited liability company; Netrian Ventures, Ltd., an entity of unknown origin; and Defendant iHoldings.com, Inc., a recently dissolved Florida corporation, currently maintain or maintained their principal place of business at 501 NE 1st Ave., Suite 201, Miami, Florida 33132; and defendant Juan Pablo Vazquez ("Vazquez") is an individual residing at 11605 SW 99 Court, Miami, Florida 33126.

4.      Plaintiffs have filed a Complaint against Defendants for cybersquatting under 15 U.S.C. § 1125(d), trademark infringement and trademark counterfeiting under 15 U.S.C. § 1114(1), trademark and trade name infringement under Florida Statutes § 495.151, false designation of origin under 15 U.S.C. § 1125(a), dilution under 15 U.S.C. § 1125(c) and Florida Statutes § 495.151, and unfair competition under Florida Statutes § 501.201 and the common law of the State of Florida.

**B.      Plaintiffs' Business and Their Trademarks**

5.      Dell is a leading manufacturer and distributor of computer systems and accessories through direct marketing channels. Building on the direct business model it pioneered, Dell receives customer orders for computer equipment via the Internet, e-mail, telephone and facsimile, and ships products directly to customers according to their customized specifications.

6.      Dell also sells a large selection of computer peripheral products and renders an extensive array of computer-related services.

7.      Beginning in 1987, Dell created and began using its trade name, trademark and service mark DELL and variants thereof to identify and distinguish its products and services. These marks have been extensively promoted, marketed and used for almost twenty years, and have become famous.

8.      Dell holds more than thirty federal registrations for its marks that feature or include the word "DELL," the first of which was registered in 1988, and several of them have become incontestable under 15 U.S.C. § 1065. Dell also holds federal registrations for several other trademarks, a good portion of which have become incontestable as well.

9.      With its direct business model, Dell continues to be a pioneer and leader in using the Internet to market and sell its goods and services. Of course, Dell's website at www.dell.com, which has been operating since 1994, is a lynchpin of its direct marketing and sales operations, with over half of Dell's domestic revenues being generated via the Internet. This website is visited by millions of customers annually, making Dell one of the Internet's most successful online businesses; www.dell.com is itself a federally registered trademark of Dell.

10.     Dell also owns or is affiliated with a number of other domain names through which it conducts business, such as dellfinancialservices.com, delladapterprogram.com, dell4me.com, and delloutlet.com.

11.     Alienware, a wholly owned subsidiary of Dell, is a leading manufacturer and distributor of high-performance computer systems for gaming, entertainment, and the generation of media content. As with Dell, Alienware's goods are sold in direct marketing channels and largely over the Internet. Alienware owns the incontestable federal registration for its ALIENWARE mark, and promotes this mark heavily on its decade-old website at www.alienware.com.

C.      **Defendants' Activities Generally**

12.     Defendants BelgiumDomains, CapitolDomains, and DomainDoorman have obtained accreditation from the Internet Corporation for Assigned Names and Numbers ("ICANN") as domain name registrars (the "Registrar Defendants").

13.     Defendant Netrian is listed in documents filed with the Florida Department of State's Office as the Corporate Manager for Defendants BelgiumDomains, CapitolDomains, and DomainDoorman. Defendant Netrian appears to be an offshore holding company (licensed in the

3

British Virgin Islands), notwithstanding that it lists its address in Miami with the Florida Department of State's Office. Defendant iHoldings was formerly listed as the Corporate Manager for these companies.

14.   Defendants, who reside or are located in Florida, operate under a number of shell entities, fictitious businesses, and personal names, many of which appear to be located in the Caribbean, and formerly operated entities in Central America and the Far East (the "Defendant Entities").

15.   Some of the Defendant Entities used (or formerly used) by Defendants include:

Shell Entities

- Caribbean Online International Ltd., Nassau, Bahamas
- Domain Drop S.A.,Charlestown, West Indies, Saint Kitts and Nevis
- Keyword Marketing, Inc., Charlestown, West Indies, Saint Kitts and Nevis
- Maison Tropicale S.A., The Valley, British West Indies, Anguilla
- Marketing Total S.A., Charlestown, West Indies, Saint Kitts and Nevis
- Click Cons. Ltd, Nassau, Bahamas
- Web Advertising, Corp., Nassau, Bahamas
- Wan-Fu China, Ltd., Nassau, Bahamas

Aliases

- Alvaro Collazo, Tarariras, Colonia 70000, R.O.U.
- Unasi Management Inc., Panama.
- Domaincar, Panama.
- Unasi (or Unaci) Management Inc., San Juan, Philippines.
- J. Lee, Kowloon, Hong Kong.
- Wang Lee Domains Ltd, Port Louis Mauritius.
- International Names Ltd., Nassau, Bahamas.
- Pertshire Marketing, Ltd, Tortola, British Virgin Islands.

16.   The Registrar Defendants and Defendant Entities are all controlled and their day-to-day operations managed by Defendant Vazquez. Defendant Vazquez conducts the day-to-day business of Defendants from his home at 11605 SW 99 Court, Miami, Florida 33126.

17.   Defendants have registered and used millions of domain names. Many of these domain names contain famous or distinctive trademarks (or variations thereof) owned by others, including the following trademarks that also serve as the names of some of the world's most well-

4

known companies: AMERICAN EXPRESS, BANK OF AMERICA, CINGULAR WIRELESS, DIRECT TV, FORD, GENERAL MOTORS, J.C. PENNEY, LAND ROVER, MAPQUEST, NASCAR, OFFICE DEPOT, RADIO SHACK, SEARS, TOYOTA, UNITED AIRLINES, VICTORIA SECRET, WALMART, XM SATELLITE, YAMAHA, and ZANTAC. Defendants' portfolio of domain names has so many domain names that contain famous or distinctive trademarks (or variations thereof) that the representative list of such names filed in support of Plaintiffs' Complaint, which includes only one famous mark for each letter of the alphabet, is more than 910 pages long and contains over 18,000 domain names.

18.     Defendants identify available domain names they believe will be profitable because of anticipated Internet traffic resulting from "typosquatting"—domain names containing typographical variations of others' marks—and the consumer confusion it causes. Defendants also register and use domain names that combine others' marks (or variations thereof) with generic or descriptive terms.

19.     Defendants employ the Defendant Entities, as well as other technical means, to conceal their true identities and activities.

20.     WHOIS data provides, among other information, the full name of the registrant of the domain name and the registrant's contact information. Domain name registrars, including Defendants BelgiumDomains, DomainDoorman, and CapitolDomains are required by ICANN to provide free public query-based access to up-to-date WHOIS data.

21.     Historical WHOIS ownership records reveal that some or all of the Defendant Entities are used as part of Defendants' scheme. For example, the domain name americnaexpress.com listed "J Lee" as the registrant in March 2005; then "Unasi Inc." in August 2005; then "Wang Lee Domains Ltd." in August 2006; and then "Caribbean Online International Ltd." in May 2007. Each WHOIS record has the same "create date" indicating that the domain name

was never deleted and re-registered by any of the registrants, but was instead "transferred" from one to the other, to the other, etc. Further, just as with the americnaexpress.com domain name, each of Defendants' shell entities uses or used BelgiumDomains, CapitolDomains, DomainDoorman, and/or iHoldings as the registrar for their domain name registrations.

22.     Defendants use the Defendant Entities to register hundreds of thousands of domain names every day, and to move these domain names back and forth among themselves to avoid having to pay registration fees and to avoid detection by trademark owners and others.

23.     Defendants delete many of the domain names they register within five days of registration to receive a refund of Defendants' registration costs and to avoid detection by trademark owners. Only registrars accredited by ICANN, including Defendant Registrars, are able to delete domain names; this feature is not generally available to the consuming public.

24.     The practice of registering and deleting domain names within five days that do not generate sufficient traffic to turn a profit in order to avoid paying for the registration is commonly referred to as "tasting." Recent ICANN reports show that Defendants DomainDoorman, BelgiumDomains, and CapitolDomains are by far the top three registrars involved in domain name tasting.

25.     The practice of repeatedly registering, deleting, and reregistering the same domain name within five days to avoid paying for the registration is known as "kiting."

26.     Because Defendants operate multiple domain name registrar companies and use multiple alter egos and shell entities, Defendants are able to continuously kite domain names virtually without detection. For example, after one of Defendants' Registrars registers a domain name containing a trademark owners' mark (or variation thereof) listing one of Defendants' shell entities as the registrant, the domain name is deleted within five days and then immediately registered by another of Defendants' Registrars listing another of Defendants' shell entities as the registrant. As the pattern repeats, Defendants often re-register the same domain names to the same shell entities.

6

27.     Defendants' kiting scheme not only enables them to avoid paying the registration fees for the domain names, but it also tends to erase or at least obfuscate Defendants' "electronic tracks," making detection by trademark owners very difficult. Defendants further impede efforts by trademark owners to detect infringements by limiting the number of WHOIS queries that can be made using the WHOIS databases of Defendants' Registrars, allowing only a few queries per day.

28.     As Defendants move these domain names back and forth every five days, they use the domain names to attract Internet users searching for genuine websites associated with the famous or distinctive trademarks misspelled in Defendants' domain names. Defendants host websites at these domain names that display links and advertisements featuring goods or services directly competitive with or related to those sold or offered in connection with the trademarks. When a user clicks on one of these links, he or she is taken to a web page at the direction of the party who sponsored that entry, which is known as a click-through. The websites sometimes also display pop-up or pop-under advertisements. Advertisers, search engines, and affiliate programs pay Defendants each time a user clicks on a link at the website or every time an advertisement is displayed.

29.     Many of Defendants' web pages also display a search box for use in conducting Internet searches.

**D.     Defendants' Activities Regarding Plaintiffs and Their Trademarks**

30.     Defendants have registered at least 1,100 domain names that are identical or confusingly similar to Plaintiffs' Marks, most of which are also counterfeits of Plaintiffs' Marks. Defendants use these domain names to host websites that display links, advertisements, pop-up advertisements, or pop-under advertisements featuring goods or services that are directly competitive with or related to Plaintiffs' goods and services. Defendants have received and continue to receive payment for advertising clicks and click-throughs on the websites hosted at these domain names.

31.     In fact, in the last month alone, Defendants have registered at least 146 additional domain names consisting of Plaintiffs' Marks (or variations thereof).

7

E.      **Other Legal Proceedings Against Defendants**

32.     Trademark owners have filed hundreds of UDRP proceedings against Defendants relating to their domain names containing other trademark owners' marks or variations thereof.

33.     Trademark owners have filed at least nine civil actions against Defendants for cybersquatting, and Defendants have been enjoined in six of those cases.

## II.   CONCLUSIONS OF LAW

1.      The Eleventh Circuit standards governing a TRO are the same as those for a preliminary injunction. *See Chandnani v. V. Secret Catalogue Inc.*, 2001 U.S. Dist. LEXIS 8069, at *5 (S.D. Fla. Mar. 19, 2001). To obtain a TRO and a preliminary injunction, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to Plaintiffs outweighs the harm an injunction may cause Defendants, and (4) granting the injunction would not disserve the public interest. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002).

A.      **Plaintiffs Have A Substantial Likelihood of Success on the Merits of Their Cybersquatting Claim**

2.      Pursuant to the Anticybersquatting Consumer Protection Act ("ACPA"), cybersquatting is the (1) registration, use, or trafficking in, a domain name (2) that is identical or confusingly similar to a distinctive or famous trademark, (3) with a bad-faith intent to profit from the mark. 15 U.S.C. § 1125(d).

1.      **Defendants' Registration and Use of Domain Names**

3.      Defendants have registered and used at least 1,100 domain names that are confusingly similar to or are counterfeits of Plaintiffs' Marks. Defendants have used these domain names to host websites that display links, advertisements, pop-up advertisements, or pop-under

advertisements featuring goods and/or services that are directly competitive with or related to Plaintiffs' goods and services.

### 2. The Infringing Domain Names are All Confusingly Similar to Plaintiffs' Famous and Distinctive Marks

#### a) Plaintiffs' Marks are Distinctive and Famous

4.      Dell owns numerous United States trademark registrations for its DELL Marks.

5.      The DELL Marks have been used in interstate commerce by Dell for the past nineteen years to designate the products and services offered by DELL. Dell expends substantial effort and expense to protect the distinctiveness of the DELL Marks in the marketplace, and as a result, the DELL Marks are unique and distinctive and designate a single source of origin.

6.      Alienware owns United States trademark registration No. 2,616,204 for its ALIENWARE Mark.

7.      Alienware has used the ALIENWARE Mark in interstate commerce for the past ten years to designate Alienware's products and services. Alienware expends substantial effort and expense to protect the distinctiveness of the ALIENWARE Mark in the marketplace. As such, the ALIENWARE Mark is unique and distinctive and designates a single source of origin.

8.      Dell also owns United States trademark registrations Nos. 2,756,363, 2,171,257, 2,254,835, 1,962,286, 1,977,038, and 1,930,206 for its AXIM, DIMENSION, INSPIRON, LATITUDE, OPTIPLEX, AND POWEREDGE marks, respectively. Registration Nos. 2,254,835, 2,171,257, 1,977,038, and 1,9302,06 are incontestable pursuant to 15 U.S.C. § 1065. These marks have been used in interstate commerce by Dell for years to designate the products and services offered by Dell. Dell expends substantial effort and expense to protect each of these mark's distinctiveness in the marketplace. As such, these marks are unique and distinctive and designate a single source of origin.

9

9.      Plaintiffs' Marks are also famous marks. "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark possesses the requisite degree of recognition, courts may consider all relevant factors, including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered. Id.

10.     Plaintiffs' Marks have, for years, been extensively used in throughout the country. For several years Plaintiff Dell (including it owned subsidiary, Alienware) has been the world's largest direct seller of computer systems. During the last fiscal year Plaintiffs had revenues of over $55 billion dollars.

11.     Plaintiffs' Marks are widely known and recognized among consumers and members of the trade throughout the country. Having been widely promoted to the general public, and having exclusively identified Plaintiffs and their products and services, Plaintiffs' Marks symbolize the tremendous goodwill associated with Plaintiffs and are a property right of incalculable value. Further, Plaintiffs' Marks have long enjoyed unquestionable fame as a result of favorable general public acceptance and recognition. Plaintiffs' Marks are the subject of numerous federal registrations, many of the registrations are incontestable under 15 U.S.C. § 1065.

**c)      Defendants Have Registered At Least 1,100 Domain Names That Are Confusingly Similar to Plaintiff's Marks**

12.     Defendants have registered at least 1,100 domain names that are confusingly similar to Plaintiffs' Marks. A representative list of these confusingly similar domain names includes names like: dellalptops.com; delloultet.com; delldot.com; alienwaere.com; aliwenware.com; and alienwarre.com. The full list of these confusingly similar domain names appears in Exhibit B to the Steele Declaration.

13.     Many of Defendants' domain names are confusingly similar to Plaintiffs' Marks because they are misspellings of Plaintiffs' Marks. For example, alienwarre.com merely adds an extra letter "r" in the ALIENWARE Marks; delloultet.com merely transposes the letters "l" and "t" in Dell's own domain name delloutlet.com; and al9ienware.com merely inserts the number "9" (the number "9" and the letter "i" are close to each other on the keyboard and will often be pushed by accident when typing). Such misspellings are "confusingly similar" under the ACPA. *Shields v. Zuccarini*, 254 F.3d 476, 484 (3d Cir. 2001); *see also N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n.14 (1st Cir. 2001) (the identical or confusingly similar requirement of the ACPA looks to the facial similarity of the domain name with the mark).

14.     Other of Defendants' infringing domain names merely append to Plaintiffs' Marks a generic or descriptive word associated with Plaintiffs' goods or services. For example, the dell-desktop-computers.com domain name merely appends the words "desktop" and "computers" to one of the DELL Marks.[1] Such domain names are also "confusingly similar" under the ACPA. *See, e.g., Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 67-78 (E.D. Va. 2001), *aff'd in part, rev'd in part*, 302 F.3d 214 (4th Cir. 2002) (domain names adding descriptive or generic terms like "bank," "financial," and "shopping" to the mark HARRODS held confusingly similar).

15.     Defendants host websites at many of the 1,100 infringing domain names, displaying advertisements and links to goods and services that are directly competitive or closely related to Plaintiffs' goods and services. Defendants' effort to capitalize on Internet users' misspellings and mistypings—when such users are actually looking for Plaintiffs' websites—is further evidence that each of the domain names is confusingly similar to Plaintiffs' Marks.

---

[1] As discussed above, the DELL Marks are famous and used in connection with, among other goods and services, desktop computers.

### 3.   Defendants Have a Bad-Faith Intent to Profit from Plaintiffs' Marks

16.   In determining whether Defendants possessed the required bad-faith intent to profit from Plaintiffs' Marks, the ACPA identifies nine factors for courts to examine: (1) the trademark or other intellectual property rights of Defendants, if any, in the domain names; (2) the extent to which the domain names consist of the legal name or commonly used names of Defendants; (3) Defendants' prior use of the domain names for the bona fide offering of goods or services; (4) any bona fide noncommercial or fair use of the mark under the domain names; (5) Defendants' intent to divert consumers from Plaintiffs' websites to Defendants' websites by creating a likelihood of confusion; (6) Defendants' offer to transfer, sell, or otherwise assign the domain names to Plaintiffs or others for financial gain; (7) Defendants' provision of material and misleading false contact information when registering the domain names and their intentional failure to maintain accurate contact information; (8) Defendants' registration or acquisition of multiple domain names that they know are identical or confusingly similar to marks of others; and (9) the extent to which Plaintiffs' Marks are or are not distinctive and famous. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX). Having considered each of these factors, they strongly support a finding that Defendants registered and used at least 1,100 confusingly similar domain names with a bad-faith intent to profit from Plaintiffs' Marks.

### a)   Factor I—The trademark or other intellectual property rights of Defendants, if any, in the domain names—Favors Plaintiffs

17.   Defendants have no intellectual property rights in any of the 1,100 confusingly similar domain names. Nor have Plaintiffs authorized Defendants to register or use Plaintiffs' Marks within domain names or otherwise. Factor I thus supports a finding that Defendants registered the confusingly similar domain names with a bad-faith intent to profit from Plaintiffs' Marks.

b)    **Factor II—The extent to which the domain names consist of the legal name or commonly used names of Defendants— Favors Plaintiffs**

18.    None of the 1,100 confusingly similar domain names consist of the legal name of any Defendant. Nor is any Defendant commonly known by any of these confusingly similar domain names. There is no legitimate use for them by anyone but Plaintiffs. Therefore, Factor II also supports a finding of a bad-faith intent to profit.

c)    **Factor III—Defendants' prior use of the domain names for the bona fide offering of goods or services—Favors Plaintiffs**

19.    Defendants use the confusingly similar domain names to attract unsuspecting Internet users trying to reach Plaintiffs' websites to websites featuring advertisements and links to goods or services directly competitive with or related to Plaintiffs' goods and services. It is well settled that misdirecting Internet traffic with the intent to trade on another party's mark is unlawful. *Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999). Because this unlawful use cannot be a bona fide offering of goods or services, Factor III also favors Plaintiffs.

d)    **Factor IV—Any bona fide noncommercial or fair use of the mark under the domain names—Favors Plaintiffs**

20.    Defendants' use of the 1,100 confusingly similar domain names was and is purely commercial. They selected and registered domain names that would generate revenue from advertisers, search engines, and affiliate programs, and maximize Defendants' returns. Further, none of Defendants' websites contain or contained any commentary about, or comparisons of, Plaintiffs' goods or services, and thus Defendants' use was and is not a noncommercial or bona fide fair use. Thus, Factor IV also supports a finding of Defendants' bad-faith intent to profit.

    e)  **Factor V—Defendants' intent to divert consumers from Plaintiffs' websites to Defendants' websites by creating a likelihood of confusion—Favors Plaintiffs**

  21. Given the striking similarity between the 1,100 confusingly similar domain names and Plaintiffs' Marks, and the fact that many of the websites feature links to goods and services directly competitive or related to Plaintiffs' goods and services, Defendants' intent was unquestionably to divert consumers navigating to Plaintiffs' websites to their own commercial websites. "Cybersquatters often register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, many of which are . . . sites that derive advertising revenue based on the number of visits, or 'hits,' the site[s] receive[]." *Zuccarini,* 254 F.3d at 484. The only reason that consumers would access the websites at any of the 1,100 confusingly similar domain names is because these domain names are misspellings, mistypings, or variations of Plaintiffs' Marks.

  22. Moreover, Defendants clearly knew of Plaintiffs' Marks before Defendants registered and used the infringing domain names because Plaintiffs' Marks are registered and are famous. Such knowledge of Plaintiffs' Marks shows Defendants' intent to divert consumers from Plaintiffs' websites. *See Venetian Casino Resort LLC v. Venetiangold.com,* 380 F. Supp. 2d, 737, 744 (E.D. Va. 2005) (finding that because registrant knew of plaintiff's use of the VENETIAN mark before registering the domain names, registrant intended to divert consumers from plaintiff's website). Accordingly, Factor V favors Plaintiffs.

f)   **Factor VI—Defendants' offer to transfer, sell, or otherwise assign the domain names to Plaintiffs or others for financial gain—is Neutral**

23.   Plaintiffs are not aware at this time of any evidence that Defendants sold or offered to sell the nearly 1,100 confusingly similar domain names for financial gain. Factor VI is thus neutral.

g)   **Factor VII—Defendants' provision of material and misleading false contact information when registering the domain names and their intentional failure to maintain accurate contact information—Favors Plaintiffs**

24.   Defendants employ numerous means to conceal their true identities and involvement in the registration and use of the infringing domain names, including use of numerous shell entities, fictitious businesses, and personal names. Defendants have exhibited a pattern of prior conduct of failing to list or maintain accurate contact information by listing fictitious businesses and personal names as the domain name registrants. Defendants also intentionally limit the number of WHOIS queries that can be made using their systems, allowing only a few queries per day.

h)   **Factor VIII—Defendants' registration or acquisition of multiple domain names that they know are identical or confusingly similar to marks of others—Favors Plaintiffs**

25.   Courts consider excessive numbers of infringing domain names as strong proof of bad faith. *See Zuccarini,* 254 F.3d at 485 n.5 (Zuccarini's registration of thousands of Internet domain names that are identical or confusingly similar to the distinctive marks of others reflects a "pattern of behavior . . . consistent with a bad faith intent to profit"). Here, Defendants have registered at least tens of thousands of infringing domain names. Defendants have registered so many domain names that infringe famous trademarks that the representative list filed in support

15

of Plaintiffs' Complaint contains nearly 18,000 such domain names. Factor VIII thus strongly supports a finding of Defendants' bad-faith intent to profit from Plaintiff's Marks.

### i) Factor IX—The extent to which Plaintiffs' Marks are or are not distinctive and famous—Favors Plaintiffs

26. Factor IX also strongly supports Defendants' bad-faith intent to profit. As shown above, Plaintiffs' Marks are some of the most famous and distinctive marks in the world.

### j) Additional Bad-faith Factors Favor Plaintiffs

27. The nine factors listed by the ACPA are not exclusive, and courts expressly indicate that other factors may be considered. *See, e.g., Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000). Here, Defendant registrars are in a position of trust as ICANN-accredited registrars. By concealing their unlawful activities, however, they have grossly abused their position of trust to the detriment of Plaintiffs' customers and the general public, as well as Plaintiffs and countless other trademark owners. This abuse of trust further supports, and indeed amplifies, Defendants' bad-faith intent.

28. Because Defendants are both the registrant and registrar, Defendants do not qualify for the "safe harbor" provision of the ACPA that exempts domain name registrars from liability "for injunctive or monetary relief . . . except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order." 15 U.S.C. §1125(d)(2)(D)(ii). Moreover, even if Defendants were just the registrar, they would not qualify for this exemption because they have acted in "bad faith" and with "reckless disregard" of known trademark rights of Plaintiffs and countless other trademark owners.

29. There is a substantial likelihood of Plaintiffs' success on the merits of their cybersquatting claim.

16

**B.**   **Plaintiffs Have A Substantial Likelihood of Success On The Merits Of Their Counterfeiting Claim**

30.     To establish liability for counterfeiting, Plaintiffs must prove that Defendants used a "counterfeit" of Plaintiffs' registered Plaintiffs' Marks without Plaintiffs' consent in connection with the sale, offering for sale, distribution, or advertising of goods or services and that such use is likely to cause confusion or to cause mistake or deceive. 15 U.S.C. § 1114(1)(a). The Lanham Act defines "counterfeit" as a spurious mark that is identical with, or substantially indistinguishable from a registered mark. 15 U.S.C. § 1127. A showing of intent or bad faith is unnecessary to establish liability for counterfeiting under 15 U.S.C. § 1114(1)(a) or to seek injunctive relief pursuant to 15 U.S.C. § 1117(a). *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1475-76 (11th Cir. 1991); *Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing, Inc.*, 2003 U.S. Dist. LEXIS 8788, at *43 (N.D. Ga. May 9, 2003).

**1.**   **Defendants Registered and Used Counterfeits of Plaintiffs' Marks Without Consent**

31.     In *Petmed Express, Inc. v. Medpets.com, Inc.*, the plaintiff owned federal trademark registrations for the marks PETMED EXPRESS, INC. and 1888PETMEDS, and marketed pet-care medicines and products over the Internet using the domain names 1888petmeds.com, petmeds.com, 1800petmeds.com, and petmedexpress.com. 336 F. Supp. 2d 1213, 1216 (S.D. Fla. 2004). Defendants began selling pet-care products via a website using the domain names medpets.com and 1888medpets.com. The court found that "Defendants' domain names are counterfeit marks likely to confuse consumers into [mistakenly] thinking that [defendants' websites] www.medpets.com and www.1888medpets.com are associated with PetMed." *Id.* at 1220.

32.     Plaintiffs' Complaint (¶123) lists numerous examples of Defendants' 1,100 confusingly similar domain names that Plaintiffs assert are counterfeits of Plaintiffs' Marks. These domain names either contain the DELL Marks (*e.g.*, dell-computers-help.com), or differ from the

ALIENWARE Marks by only one character (*e.g.*, al9ienware.com). In some cases, such as dellinkprinter.com, Defendants add a generic or descriptive term associated with Plaintiffs' goods or services. The Court finds that these domain names are "counterfeits" because they are identical to, or substantially indistinguishable from, Plaintiff's registered Plaintiffs' Marks and, without Plaintiffs' consent, Defendants used these names in connection with advertising services that are identical to those covered by Plaintiffs' federal registrations.

### 2.    Defendants' Use and Registration of Counterfeits of Plaintiff's Marks is Likely to Cause Confusion

33.    Defendants' domain names containing counterfeits of Plaintiffs' Marks are likely to cause confusion. Defendants use (or used) Plaintiffs' Marks (and substantially indistinguishable variations thereof) in their domain names to derive benefit from the goodwill associated with Plaintiffs' Marks by diverting Internet users to Defendants' websites. This intent alone creates an inference that a likelihood of confusion exists. *See Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999); *see also Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1172 (11th Cir. 1991).

34.    Likelihood of confusion may also be determined by considering the following seven factors: (1) type of mark (i.e., the mark's strength); (2) similarity of marks; (3) similarity of the products that the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) the defendant's intent; and (7) actual confusion. *Frehling Enters*, 192 F.3d at 1335.

35.    These seven factors also weigh in favor of a likelihood of confusion because: (1) Plaintiff's Marks are distinctive and famous, and entitled to a broad scope of protection; (2) Defendants' domain names are identical or substantially indistinguishable from Plaintiffs' Marks as shown above; (3) the goods and services advertised under Defendants' scheme are identical to, competitive with, or related to the goods and services offered by Plaintiffs and

18

covered by their registrations for Plaintiffs' Marks; (4) Defendants' "customers" are the same as Plaintiffs' customers, because they *are* Plaintiffs' customers, i.e., Defendants are targeting customers of Plaintiffs who misspell or mistype Plaintiffs' trademarks as the customers are seeking to navigate to Plaintiffs' websites; (5) both Defendants and Plaintiffs use web pages to advertise goods and services to consumers on the Internet; (6) there is no other point to Defendants' scheme but to trade on the reputation and goodwill of Plaintiffs by misdirecting Internet users for Defendants' commercial gain; and (7) because no Internet user intentionally starts out mistyping a well-known trademark to find competitors' websites, each time an Internet user looking for Plaintiffs' web properties mistakenly reaches any of Defendants' websites constitutes an instance of actual confusion.

36.     There is thus a substantial likelihood of Plaintiffs' success on the merits of their trademark counterfeiting claim.

**C.     There Is a Substantial Threat of Irreparable Injury to Dell If the Injunction Is Not Granted**

37.     Plaintiffs face a substantial threat of serious irreparable injury if an injunction does not issue. Where a trademark owner shows a likelihood of confusion, irreparable injury is presumed. *PepsiCo, Inc. v. Distribuidora La Matagalpa, Inc.*, 2007 U.S. Dist. LEXIS 40711, at *14-15 (S.D. Fla. June 5, 2007) (citation omitted) ("trademark infringement and unfair competition by their very nature result in irreparable injury because of the attendant loss of goodwill, reputation and business"); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1157 (S.D. Fla. 1991) ("[t]he existence of a likelihood of confusion constitutes irreparable injury as a matter of law sufficient to satisfy the requirements of Fed. R. Civ. P. 65").

38.     Even without this presumption, Plaintiffs are harmed every day that their customers are diverted to Defendants' websites. Plaintiffs lose control over the reputation of their trademarks

when consumers cannot use those marks to reliably reach Plaintiffs' Internet services. The gravity of injury to Plaintiffs is further enhanced because "[Defendants' counterfeit] marks appear[] on the Internet, thereby reaching a substantial number of customers." *Petmed*, 336 F. Supp. 2d at 1221. *See Shields v. Zuccarini,* 89 F. Supp. 2d 634, 641 (E.D. Pa. 2000) *aff'd* 254 F. 3d 476 (3rd Cir. 2001) ("this sort of injury is not easily compensable after the fact, as it will be nearly impossible to discover how many Internet users did *not* visit [Plaintiffs'] site because of [Defendant's] domain names") (emphasis in original). The injury to Plaintiffs, which operates extensive online businesses, is thus real, immediate, and irreparable.

39.     Moreover, in the last month alone, Defendants have registered at least 146 additional domain names consisting of misspellings and mistypings of Plaintiffs' Marks, or merely appending a generic or descriptive term to Plaintiffs' Marks (or a variation thereof). This repeated and massive infringement, in blatant disregard of Plaintiffs' well-established trademark rights, demonstrates the need for the requested relief. Unless Defendants are temporarily restrained, they will continue to violate Plaintiffs' rights, and cause immediate and further irreparable harm to Plaintiffs and Plaintiffs' Marks.

### D.     The Threatened Injury to Dell Far Outweighs the Harm an Injunction May Cause Defendants

40.     As against the substantial injury to Plaintiffs discussed above: "Any harm suffered by defendants was brought about by their own actions. . . Defendants' self-inflicted harm is far outweighed by the immeasurable damage done [to the plaintiff] by the infringement of its Marks. Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992).

41.     Indeed, Defendants' intentional and reckless cybersquatting and counterfeiting of Plaintiffs' Marks carried with it a clear risk of an injunction and damages. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990); *Processed Plastic*

*Co. v. Commc'ns, Inc.*, 675 F.2d 852, 859 (7th Cir. 1982) (finding defendant had copied plaintiff's toy car and thus "cannot now complain that having to mend its ways may be too expensive").

42.     As a practical matter, Plaintiffs seek an injunction against a very small portion of Defendants' operation—only the portion that infringes Plaintiffs' Marks. Unless an injunction issues, Defendants will continue to register confusingly similar domain names and counterfeit domain names, causing further harm to Plaintiffs and the public. On the other hand, granting an injunction will prevent Defendants only from profiting from its illegal behavior, which is not a cognizable "hardship" that this Court should consider. Moreover, nothing in the injunction would prevent Defendants from registering non-infringing domain names. Finally, Plaintiffs may be required to post a bond that will compensate Defendants for any possible monetary harm it might suffer if the injunction later is deemed improper. *See* Fed.R.Civ.P. 65(c). In short, the balance of hardships tips strongly in Plaintiffs' favor.

### E.      The Requested Injunction Would Not Disserve the Public Interest

43.     The injunction sought here would clearly not disserve the public interest. Defendants are trading on the fame and goodwill of others' trademarks to divert Internet users for Defendants' commercial gain. Putting a preliminary end to Defendants' actions as they relate to Plaintiffs' Marks would be a benefit, not a disservice, to the public by protecting it from confusion and deception. *Majeed*, 805 F. Supp. at 1006 (explaining that the public has an interest in preventing consumer confusion).

44.     Plaintiffs have has sufficiently demonstrated the reasons that notice of the temporary restraining order should not be required.

### F.      An Order Restraining Defendants from Destroying and Moving Evidence is Appropriate

45.     While under normal circumstances commencing litigation would itself be sufficient to put a defendant on notice that all materials potentially usable as evidence should be preserved,

21

these are not normal circumstances. Defendants are engaged in an intricate scheme and they have taken and continue to take many affirmative steps to conceal it. The risk that Defendants will destroy or move relevant data or documents is great. Defendants have employed numerous and extensive devices to avoid detection by trademark owners. Further, the Defendant Entities have extensively employed offshore locations to further obscure detection in an effort to limit U.S. jurisdiction. Defendants BelgiumDomains, CapitalDomains, and DomainDoorman are each managed by Netrian, which itself appears to be an off-shore company.

46.     Further increasing the risk that Defendants may destroy or move evidence is the ease with which the records Plaintiffs seek to seize can be destroyed and transferred. Much of the evidence Plaintiffs hope to use in the prosecution of this action is in electronic form and subject to quick, easy, untraceable destruction by Defendants. For example, most if not all of the domain name registration, renewal, and transfer process is done online, i.e., electronically.

47.     Moreover, domain name registrants generally receive notifications relating to every aspect of the domain name registration, renewal, and transfer process by email. E-mail is clearly the customary and preferred method of communication for domain name matters. In addition, the process for Defendants receiving payments for advertising clicks and click-throughs on their websites corresponding to the infringing domain names is handled primarily if not exclusively by electronic means.

48.     Accordingly, Defendants must be enjoined from destroying and moving any of their business records, and ordered to retain all relevant records.

Based on the foregoing Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED AND ADJUDGED** that:

1.     Defendants, their officers, agents, servants, employees, and attorneys, along with those persons in active concert or participation with them who receive actual notice of this Order by

22

personal service or otherwise, shall be, and they hereby are, further immediately and temporarily **RESTRAINED AND ENJOINED:**

(a)     from destroying, altering, secreting, transferring, or otherwise disposing of any records of their business activities, whether on paper, in electronic format, or on any other medium, and including without limitation all accounting records and all logs or other documents relating to selecting, registering, trafficking in, monetizing, releasing, assigning, renewing, deleting, transferring, using, and maintaining the domain names listed in Paragraph 122 of Plaintiffs' Complaint ("Confusingly Similar Domain Names") or any domain name that is a counterfeit of or confusingly similar to Plaintiffs' Marks or any other trademarks owned by Plaintiffs;

(b)     from allowing any records of their business activities relating to selecting, registering, trafficking in, monetizing, releasing, assigning, renewing, deleting, transferring, using, and maintaining any of the Confusingly Similar Domain Names or any domain name that is a counterfeit of or confusingly similar to any trademark owned by Plaintiffs to be destroyed, altered, secreted, transferred, or otherwise disposed of in the course of business or business activities, and shall instead take all affirmative steps necessary to capture and record all such records, whether by copying, collection, backup, or otherwise, either on paper, in electronic format, or on some other medium;

(c)     from transferring, releasing, deleting, or assigning the Confusingly Similar Domain Names and any other domain names that are identical or confusingly similar to Plaintiffs' Marks or any other marks owned by Plaintiffs;

(d)     from registering, trafficking in, or using, in any manner, the Confusingly Similar Domain Names and any other domain names that are identical or confusingly similar to Plaintiffs' Marks or any other marks owned by Plaintiffs;

(e)     from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (d) above;

23

~~(f)      from otherwise communicating, directly or indirectly, with any of Defendants unless each such Defendant has been previously served with Plaintiffs' Complaint and Motions in~~ this case; and

~~(g)      subject to subpart (f), from otherwise communicating, directly or indirectly, with any third parties or persons about this action including, but not limited to, the Complaint filed in this action, this Motion and supporting papers, Plaintiffs' Motion for *Ex Parte* Seizure Order, Accelerated Discovery, and Order Sealing the File and supporting papers, and the seizure made pursuant to Plaintiffs' motions, except for Defendants' attorneys.~~

2.      Plaintiffs shall serve this Order on VeriSign, Inc., along with a list of the domain names contained in Plaintiffs' Complaint which Plaintiffs alleged infringe Plaintiffs' Marks and which are currently owned by Defendants. VeriSign, Inc. shall thereafter "lock" the Infringing Domain Names to prevent their transfer or deletion by Defendants, and shall deposit with the Court documents sufficient to establish the Court's control and authority regarding the disposition of the registration and use of the domain names pending the outcome of this case, and shall remove such domain names from its zone files so the names no longer resolve to active websites.

3.      Plaintiffs shall serve this Temporary Restraining Order, together with its *Ex Parte* Motion for Temporary Restraining Order and for a Preliminary Injunction on Defendants.

It is further **ORDERED AND ADJUDGED**:

4.      The Court will hold a Preliminary Injunction Hearing on _____ Nov. 16, 2007 at ___ 1:30 pm _____ p .m. in Courtroom __8__ at the U.S. Courthouse, 301 N. Miami Ave. 8th Floor, Miami 33128 , which date is not less than ten days nor more than fifteen days from the date of issue of this Order. Plaintiffs shall at that hearing have the burden of proving that the facts supporting the Findings of Fact and Conclusions of Law necessary to support the Temporary Restraining Order are still in effect. If

24

Plaintiffs fail to meet that burden, the Temporary Restraining Order shall be dissolved or modified appropriately.

     5.    Plaintiffs shall post a cash or corporate surety bond, in the amount of _____



~~twenty~~ five thousand dollars (\$ 25,000.00 ) as security, this Court having *c/oce* determined that such amount is adequate for the payment of such damages as Defendants may be entitled to recover as a result of this Order and the orders herein. A copy of the bond shall be filed with the clerk prior to any seizure. *c/oce*

[ ~~Plaintiffs shall not be required to post a bond.~~ ] *c/oce*

This Order is issued this __2nd__ day of ~~October~~ November 2007, at the hour of __10:15 a.m.__

_____
UNITED STATES DISTRICT JUDGE

cc:    Copies to Counsel for Plaintiffs